# STATE OF CONNECTICUT *v.* GEORGE J.
## (SC 17577)
## (SC 17578)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued September 8—officially released November 28, 2006

*Jeremiah Donovan*, for the appellant (defendant).

*Theresa Anne Ferryman*, senior assistant state's attorney, with whom, on the brief, was *Kevin T. Kane*, state's attorney, for the appellee (state).

KATZ, J. In these consolidated cases, the defendant, George J.,[1] appeals from the trial court's judgments of conviction, rendered after a jury trial, in the first case, of sexual assault in the first degree in violation of General Statutes (Rev. to 1993) § 53a-70 (a) (2), as amended by Public Acts 1993, No. 93-340, § 14 (P.A. 93-340),[2] and risk of injury to a child in violation of General Statutes (Rev. to 1993) § 53-21,[3] for sexual acts committed against the defendant's foster son S.J., and, in the second case, of sexual assault in the second degree in violation of General Statutes (Rev. to 1993) § 53a-71 (a) (1), as amended by P.A. 93-340, § 2,[4] and risk of injury to a child in violation of § 53-21 for sexual acts committed against another boy, K.M. The defendant's principal claims on appeal are that: (1) his prosecution was barred in whole or in part by the statutes of limitations; (2) the trial court improperly refused to allow the defendant to exercise peremptory challenges on the basis of

---

[1] In accordance with the policy of protecting the privacy interests of victims of sexual abuse, we do not identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] General Statutes (Rev. to 1993) § 53a-70 (a), as amended by P.A. 93-340, § 14, provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

[3] General Statutes (Rev. to 1993) § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

[4] General Statutes (Rev. to 1993) § 53a-71 (a), as amended by P.A. 93-340, § 2, provides in relevant part: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than two years older than such person . . . ."

gender; (3) the trial court improperly admitted S.J.'s testimony despite overwhelming evidence that his recollection of the sexual abuse was the result of hypnosis; and (4) the trial court improperly admitted a report by the department of children and families (department) containing multiple levels of hearsay to corroborate witnesses' testimony. We affirm the trial court's judgments.

The record contains the following undisputed facts and procedural history. S.J. became a ward of the department in 1987 when he was between the ages of four and five years old. Prior to this time, the department had removed S.J. from his birth mother's home on the basis of allegations that S.J. had been sexually abused by various men with whom his mother had had relationships, and later had removed him from the care of his paternal grandparents after allegations of sexual abuse by various men continued. There also were allegations of physical abuse. In 1988, when S.J. was six years old, the department placed him in foster care with the defendant and his wife, Eleanor J. At this time, the defendant's biological son lived with the defendant and his wife; later, another foster son, who was older than S.J., came to live at the defendant's home. Sometime in or around this period, the defendant stopped working due to a heart condition; the defendant's wife worked outside the home.

As S.J. entered adolescence, he manifested numerous troubling behaviors, including returning home late at night, lying, stealing and making sexually inappropriate remarks. After stealing a $600 video game in June, 1995, when he was twelve years old, S.J. was returned to the custody of the state. There is conflicting evidence as to whether S.J. had been warned that his behavioral problems might lead to his removal from the defendant's home and whether the defendant and his wife or the department had initiated S.J.'s removal.

The department thereafter placed S.J. at the Harmony Hill School (Harmony Hill), an institution in Rhode Island for youths with behavioral disorders. While at Harmony Hill, S.J. continued to exhibit serious behavioral and emotional problems, and he received various forms of therapy, one of which was termed "hypnotherapy." On May 22, 1996, a Harmony Hill staff member informed the department that S.J. had alleged that the defendant had molested him sexually while he was living with the defendant. S.J. previously had not made such allegations to anyone. On May 30, 1996, Lorraine Plante, an investigator for the department, interviewed S.J. On June 6, 1996, Plante faxed to the Groton police department a "notification . . . of suspected child sexual abuse . . . ." On June 10, 1996, Groton police officer Joseph Nesdill interviewed S.J., at which time S.J. alleged that the defendant had engaged in oral sex with him on a regular basis in the defendant's home. Nesdill interviewed staff from the department, as well as S.J.'s therapist at Harmony Hill, who had indicated that S.J. had mental and emotional problems and cast doubt on S.J.'s credibility. Nesdill also interviewed the defendant, who denied the allegations and claimed that S.J. had invented them because he was angry at having been removed from the defendant's home. Nesdill then presented the information that he had obtained to the office of the state's attorney, which instructed him to close the case without making an arrest.

In 2001, Nesdill reopened the case, after having received information on January 25, 2001, from Timothy Hennessey as to other young men who claimed to have been either victimized by the defendant or put at risk of such harm. Hennessey was a private investigator who worked for a firm that had been hired by Eleanor J. to conduct a background check on the defendant in connection with divorce proceedings. Eleanor J. had provided Hennessey with the names of several young

men, K.M., J.N., M.G. and T.C., all of whom were friends of Eleanor J.'s older foster son and who had visited at the house where she and the defendant lived. In the course of his investigation, Hennessey obtained a statement from K.M. alleging that the defendant had engaged in oral sex with him, as well as statements from the three other young men alleging that the defendant had engaged in acts and made comments to them that were sexually suggestive. Nesdill interviewed the young men identified by Hennessey and again interviewed both S.J., who reasserted the veracity of his 1996 allegations, and the defendant, who claimed that his wife had fabricated the allegations because of the impending divorce.

On June 7, 2001, the state issued an arrest warrant for the defendant based on S.J.'s 1996 complaint and K.M.'s 2001 complaint. In one substitute information, the state charged the defendant with sexual assault in the first degree and risk of injury to a child for having engaged in fellatio with a person under the age of thirteen, S.J., at various times between 1994 and 1995; in a second substitute information, the state charged the defendant with sexual assault in the second degree and risk of injury to a child for having engaged in fellatio with a person over the age of thirteen but under the age of sixteen, K.M., during the same period of time. Thereafter, over the defendant's objections, the trial court, *Parker, J.*, granted the state's motion to consolidate the cases for trial.

During jury selection, the defendant informed the trial court, *Hadden, J.*, that he intended to exercise peremptory challenges against prospective male jurors on the basis of their gender. Thereafter, the court refused to allow the defendant to exercise peremptory challenges against two male venirepersons when the defendant's sole objection to the men was their gender.

The defendant also filed a motion in limine to exclude S.J.'s testimony, claiming that S.J.'s recollection of the

alleged abuse had been induced hypnotically, without scientific safeguards of any kind, and that the hypnosis had resulted in implanting false memories. The trial court denied the motion, finding that S.J. had not been hypnotized. Thereafter, S.J., who was twenty-two at the time of the trial, offered the following testimony. The defendant had been sexually abusing S.J. from the time he was approximately seven years old until he was removed from the defendant's home in 1995, and even once during a visitation after he had been removed from the home. The sexual abuse by the defendant began when he asked S.J. to demonstrate how he previously had been sexually abused, and S.J. finally gave in to repeated requests and performed fellatio on the defendant. The defendant also had brought out a vibrator on one occasion when he showed S.J. and some friends a pornographic movie. On another occasion, S.J. had witnessed the defendant engage in oral sex with another boy, who, to the best of S.J.'s recollection, was K.M. According to S.J., J.N. also was present at the house that day. S.J. was not, however, able to recall many of the details of prior events or statements that he previously had made about the abuse to Nesdill, Plante, his therapists and various other persons.

K.M., who was twenty-three years old at the time of the trial, offered the following testimony. One day in the summer of 1994, when K.M. was between the seventh and eighth grades of school, he, S.J. and J.N. were in the defendant's home when the defendant played a pornographic movie for them depicting oral and anal sex between men. The defendant had asked whether the boys liked what they saw, gave vibrators to them and watched while S.J. and K.M. used the vibrators to stimulate their exposed penises. K.M. and S.J. then went into a bedroom with the defendant, where the defendant exposed his penis. K.M. performed fellatio on the defendant and observed the defendant fondle S.J.'s genitalia.

S.J. appeared to be comfortable with the acts that were taking place. Thereafter, S.J. left the bedroom, and the defendant then performed fellatio on K.M. Afterwards, K.M. returned to the living room, where J.N. still was seated. K.M. did not disclose the incident to anyone until several years later when he disclosed it first to a girlfriend, and then to Hennessey.

To corroborate the testimony of K.M. and S.J., the state offered the testimony of J.N., M.G. and T.C. J.N. testified that the defendant had shown a homosexual pornographic film to him, K.M. and S.J. According to J.N., the defendant, S.J. and K.M. then entered into a bedroom and closed the door, but S.J. emerged from the room approximately five minutes later and stated, " 'that's . . . disgusting.' " The defendant had asked J.N. to go into the bedroom with the others, but J.N. declined. M.G. and T.C. testified that they had been at the defendant's home during the general period in question while J.N. and K.M. were there. They testified that the defendant had shown the boys pornographic movies depicting heterosexual and homosexual acts and had made sexually themed remarks, including that he would like to see the boys' genitalia to see what size they were. T.C. also testified that the defendant had mentioned having a dildo or vibrator in the house.

In his cross-examination of K.M., J.N., M.G. and T.C., the defendant explored whether their accounts of these events were the product of an agreement with Eleanor J. to advance her interests in her divorce from the defendant. The state then introduced, over the defendant's objection, a portion of a department report that noted, in an entry dated November 12, 1996, that the department had received information that S.J. had given a Harmony Hill staff member a list of names of persons, which included J.N., T.C. and M.G., who he claimed could corroborate his account of the defendant's sexual abuse.

After S.J. and K.M. had testified, the defendant requested that the trial court, *Hadden, J.*, reassess the availability of certain confidential records relating to the two boys. The defendant had subpoenaed the records prior to trial, and the pretrial judge, *Clifford, J.*, had determined, after an in camera review, that they should be released in part and sealed in part. Judge Hadden denied the defendant's request to revisit the records.

The defendant subsequently moved to dismiss the cases on the ground that his prosecution on the risk of injury counts in both cases and the sexual assault count in the case involving S.J. were barred by the statutes of limitations. The trial court denied the motion. Thereafter, the jury returned a verdict of guilty on all counts in both cases. The defendant filed a motion for a judgment of acquittal and a motion for a new trial, both of which the trial court denied. In accordance with the jury's verdict, the trial court rendered judgments of guilty and sentenced the defendant to a total effective sentence of twenty years imprisonment, execution suspended after ten years, with five years probation. These appeals followed.[5] Additional facts will be set forth as needed.

The defendant asserts two claims that require us to consider whether the judgments of conviction must be reversed and directed in his favor as to the case involving S.J. and, in part, as to the case involving K.M. First, the defendant contends that his prosecution on all charges, except the second degree sexual assault against K.M., was time barred. Second, the defendant contends that the trial court improperly admitted S.J.'s testimony despite overwhelming evidence that his rec-

---

[5] The defendant appealed from the trial court's judgments to the Appellate Court, and we thereafter transferred the appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

ollection of the abuse was the result of false memories implanted during hypnosis at Harmony Hill.

The defendant also claims that the trial court committed the following improprieties that would require a new trial: (1) barred the defendant from exercising peremptory challenges to exclude venirepersons on the basis of gender when, in a criminal case, only the government should be barred from engaging in discrimination in jury selection on the basis of gender; (2) admitted, under the hearsay exception for business records, an entry in a department report to corroborate witnesses' testimony, despite numerous levels of hearsay therein; (3) admitted prior misconduct evidence that prejudiced the defendant; and (4) declined, after K.M. had testified, to conduct an independent review of K.M.'s confidential records to determine whether the defendant should be permitted to have access to them. The defendant also claims that he is entitled to a new trial on the ground of prosecutorial misconduct. We address each of these claims in turn.

I

The defendant makes two distinct claims that certain counts on which he was convicted are barred by the statutes of limitations. First, the defendant claims that his prosecution in the case pertaining to S.J. on the count alleging sexual assault in the first degree is prohibited because the extended statute of limitations for sexual offenses against children, General Statutes (Rev. to 1993) § 54-193a, as amended by P.A. 93-340, § 11,[6]

[6] General Statutes (Rev. to 1993) § 54-193a, as amended by P.A. 93-340, § 11, provides: "Notwithstanding the provisions of section 54-193, no person may be prosecuted for any offense involving sexual abuse, sexual exploitation or sexual assault of a minor except within two years from the date the victim attains the age of majority or within five years from the date the victim notifies any police officer or state's attorney acting in his official capacity of the commission of the offense, whichever is earlier, provided in no event shall such period of time be less than five years after the commission of the offense."

Although the victims' notification is the earlier event that triggers the

had commenced on June 6, 1996, when the department, through Plante, first notified the police of S.J.'s abuse allegation, not on June 10, 1996, when S.J. directly spoke with police. If he is correct, the limitations period expired before the state had issued the arrest warrant for the charges pertaining to S.J. Second, the defendant asserts that the statute of limitations for the risk of injury counts in both the case relating to S.J. and the case relating to K.M. is the general, five year limitations period for felony offenses other than capital felony or a class A felony in General Statutes (Rev. to 1993) § 54-193,[7] not the extended limitations period for sexual offenses against children under § 54-193a. Again, if he is correct, the limitations period had expired before the arrest warrant issued.

We note that both of the defendant's statute of limitations claims raise questions of statutory construction centering on the meaning of various provisions in § 54-193a: in his first claim, we must consider whether the department's notification to police of S.J.'s allegations

statute of limitations in the present case, we note that, in 2002, the legislature extended the limitations period from two years after the victim attains the age of majority to the present language of thirty years after the victim attains the age of majority. See Public Acts 2002, No. 02-138, § 1. Even if this age of majority provision were the triggering event in the present case, however, the 2002 amendment would not be applied retroactively under the rule we set forth in *State* v. *Skakel*, 276 Conn. 633, 682, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006), given that the 2002 Public Act prescribed that the amendment was "applicable to any offense committed on or after said date . . . ." Public Acts 2002, No. 02-138, § 1.

[7] General Statutes (Rev. to 1993) § 54-193 provides in relevant part: "(a) There shall be no limitation of time within which a person may be prosecuted for a capital felony, a class A felony or a violation of section 53a-54d.

"(b) No person may be prosecuted for any offense, except a capital felony, a class A felony or a violation of section 53a-54d, for which the punishment is or may be imprisonment in excess of one year, except within five years next after the offense has been committed. No person may be prosecuted for any other offense, except a capital felony, a class A felony or a violation of section 53a-54d, except within one year next after the offense has been committed. . . ."

constitutes "victim" notification; in his second claim, we must consider whether the crime of risk of injury to a child falls within the offenses described in § 54-193a. Accordingly, our review in both instances is plenary. See *Dark-Eyes* v. *Commissioner of Revenue Services*, 276 Conn. 559, 570, 887 A.2d 848 ("because this case distills to an issue of statutory interpretation, our review of that issue of law is plenary"), cert. denied, 549 U.S. 815, 127 S. Ct. 347, 166 L. Ed. 2d 26 (2006); *State* v. *Parra*, 251 Conn. 617, 622, 741 A.2d 902 (1999) (exercising plenary review over construction of amended statute of limitations).

General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." In the present case, as the discussion that follows indicates, the meaning of § 54-193 is not plain and unambiguous as to the questions before us.[8] "Accordingly, our analysis is not limited, and we, therefore, apply our well established process of statutory interpretation, under which we seek to determine, in a reasoned manner, the meaning

---

[8] The state appears to contend in its brief that § 1-2z limits our inquiry as to the defendant's second claim regarding whether risk of injury to a child falls within the scope of § 54-193a, which applies to "any offense involving sexual abuse, sexual exploitation or sexual assault of a minor . . . ." General Statutes (Rev. to 1993) § 54-193a, as amended by P.A. 93-340, § 11. Specifically, the state contends that § 54-193a "clearly" applies to risk of injury to a child. In our view, the meaning of the statute is not plain and unambiguous, because it does not refer expressly either to the crime of risk of injury or to the statute addressing that crime, and there is more than one reasonable construction based solely on the text of the statute. Indeed, because the crime of risk of injury does not *necessarily* involve sexual abuse, we certainly cannot conclude that the § 54-193a becomes unambiguous by looking to the crime charged in the present case.

of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Old Farms Associates* v. *Commissioner of Revenue Services*, 279 Conn. 465, 480–81, 903 A.2d 152 (2006).

A

We turn first to the defendant's claim regarding the statute of limitations for the first degree sexual assault charge. According to the defendant, the limitations period under § 54-193a commenced when the department notified the police of S.J.'s allegations of abuse and, therefore, had expired one day before the state issued the warrant for his arrest. The state maintains, conversely, that the limitations period commenced when S.J. directly reported the abuse to the police and, therefore, the defendant's prosecution was timely. We agree with the state.

As we have noted previously, in the spring of 1996, S.J. first reported to a Harmony Hill staff member that the defendant had sexually abused him. After Harmony Hill relayed these allegations to the department, on May 30, 1996, Plante, a department employee, interviewed S.J. regarding the allegations of abuse. On June 6, 1996, Plante notified the Groton police department via facsimile of S.J.'s allegations. On June 10, 1996, Officer Nesdill interviewed S.J., who then reported the abuse to Nesdill. The defendant was not charged with the offenses relating to these allegations until June 7, 2001, after additional witnesses were discovered who corroborated S.J.'s story.

The applicable statute of limitations provides: "Notwithstanding the [general felony] provisions of section 54-193, no person may be prosecuted for any offense involving sexual abuse, sexual exploitation or sexual assault of a minor except within two years from the date the victim attains the age of majority *or within five years from the date the victim notifies any police officer or state's attorney acting in his official capacity of the commission of the offense, whichever is earlier,* provided in no event shall such period of time be less than five years after the commission of the offense." (Emphasis added.) General Statutes (Rev. to 1993) § 54-193a, as amended by P.A. 93-340, § 11.

In the present case, it is undisputed that the earlier and, hence, operative event is the victim's notification to the police. The parties dispute, however, which event triggered the statutory period's commencement in the case of S.J.: Plante's June 6, 1996 faxed notification of suspected abuse to the police; or S.J.'s June 10, 1996 interview with Nesdill. If Plante's notice to police constitutes victim notification under § 54-193a, the June 7, 2001 warrant would fall one day outside of the five year limitations period.

The defendant claims that the statutory requirement of victim notification is satisfied when a parent or other legal representative of a minor victim notifies the police or state's attorney of the abuse. The defendant contends that such a reading of the statute is logical because a very young victim would be unlikely to be able to report the abuse to the police, and thus notification by a parent or other legal guardian should constitute notice under § 54-193a. Accordingly, because the department statutorily is deemed the legal representative of children in its care and custody and was S.J.'s legal guardian at the time he had made the allegations, the defendant contends that the department's notification should be held to commence the limitations period in § 54-193a. We

conclude that the limitations period commences only when the actual victim notifies the specified authorities.

To begin with the obvious, the statute prescribes that the limitations period begins when "the victim" notifies the specified authorities. General Statutes (Rev. to 1993) § 54-193a, as amended by P.A. 93-340, § 11. Although the statute does not define "victim," in the absence of such a definition, we typically would follow the legislature's dictate that we should apply the common meaning of the word; see General Statutes § 1-1 (a); which undeniably would restrict the meaning to the person against whom the offense was committed. Had the legislature intended a broader meaning, it readily could have indicated such an intent by providing, for example, that the limitations period commences when "the victim or the victim's legal representative" notifies the pertinent authorities. We also note that the legislative history of § 54-193a reflects no evidence that the legislature intended a broader meaning than the term "victim" normally would indicate. Indeed, when the legislature amended § 54-193a in 1993 to substitute the victim's notification in lieu of the date of the offense as a triggering event for the limitations period; see P.A. 93-340, § 11; in other sections of the Public Act the legislature expanded the class of persons who are mandated reporters of abuse. See P.A. 93-340, §§ 4, 5 and 8. Therefore, presumably the legislature was mindful when adding the "victim" notification provision that persons other than the victim first might report the abuse.

The only logical impediment we can envision that might suggest that the legislature could have intended a broader meaning of victim is if the narrower reading could result in the limitations period running for an indefinite period of time if a parent or legal representative of a minor, rather than the minor himself, were to report the abuse, as most often might occur in the

case of a preverbal child. That concern, however, is answered by examining the victim notification provision in context of the statute as a whole. We note that the legislature has been generous in its allotment of time in which a victim may report a crime of sexual abuse. Under the alternative provision to victim notification for triggering the statute of limitations, the maximum period of limitations under the statute in effect at the time of S.J.'s sexual abuse was "two years from the date the victim attains the age of majority . . . ." General Statutes (Rev. to 1993) § 54-193a, as amended by P.A. 93-340, § 11. Therefore, a victim potentially had until the age of twenty to report the sexual abuse, which ostensibly could be as many as eighteen or nineteen years after the abuse had occurred.[9] Thus, the legislature has indicated that it is not adverse to a delayed commencement of the limitations period because, in the case of notification to the proper authorities by someone other than the minor victim, the alternate provision provides that the statute of limitations expires when the victim attains twenty years of age.[10]

By so doing, the legislature has indicated that it considers paramount the opportunity for the *victim* of the crime to report the abuse. Indeed, such a determination likely reflects well documented problems of shame and repressed memories that often preclude child victims of sexual abuse from timely reporting the crime. See J. Comparet-Cassani, "Extending the Statute of Limitations in Child Molestation Cases Does Not Violate the

[9] The fact that since the defendant's crimes the legislature has amended § 54-193a to increase the limitations period to thirty years after the victim attains the age of majority; see footnote 6 of this opinion; indicates that the legislature subsequently has become even less concerned about an extended limitations period for child sexual abuse cases.

[10] The question of whether there may be due process concerns because of the delay in commencing the prosecution in certain cases is not implicated in this case, and that issue raises a separate concern that does not bear on our construction of the statute generally.

Ex Post Facto Clause of *Stogner*," 5 Whittier J. Child & Fam. Advoc. 303, 307–309 (2006);[11] see also M. Wilkinson, "Civil Procedure Tolling the Statute of Limitations: The Discovery Rule in Childhood Sexual Abuse Cases," 19 Am. J. Trial Advoc. 237 (1995) (noting that, as of 1995, majority of jurisdictions had applied discovery rule to childhood sexual abuse cases because of " 'unique character' " of cases due to repressed memories of abuse). The construction of the statute that best provides the victim with that opportunity to report the allegation is the narrower reading that would limit "victim" notification to the victim only.

Indeed, a few realistic illustrations demonstrate the rationality of construing the statute to require that only the victim's notification may commence the limitations period. A mother reports that she witnessed the father of her child abuse the child.[12] The mother later recants the allegations, out of fear of the abuser. Alternatively, the child denies the abuse when police investigate,

---

[11] "Beginning in the late 1980's, lawmakers across the country became increasingly aware that young victims often delay reporting sexual abuse because they are easily manipulated by offenders in positions of authority and trust, and because children have difficulty remembering the crimes or facing the trauma it can cause. Hence, states which traditionally limited the time for prosecuting child molestation . . . have started to substantially increase the time in which criminal charges can be filed after the assault occurred. . . .

"Child molestation cases are difficult to prosecute, because young victims of sexual abuse often have difficulty remembering the dates and times of the violations, the number of acts involved, and the nature of the acts. They also have difficulty reporting the abuse immediately thereafter, even to their own parents. They may have been dissuaded from reporting the abuse either because of shame, fear that they themselves did something wrong, or because of intimidation by the perpetrator." J. Comparet-Cassani, supra, 5 Whittier J. Child & Fam. Advoc. 307–309.

[12] In reference material presented at the 2002 annual convention of the Association of Trial Lawyers of America, it was stated that "[h]ospital records and child protective services document hundreds of thousands of cases of child sexual abuse each year in this country and roughly half involve fathers or stepfathers . . . ." F. Ochberg, "PTSD 101 For Lawyers," 2 Ann. 2002 ATLA-CLE 2125 (2002) p. 6.

either because of fear of the abusing parent or trauma induced repressed memories. In either case, the state declines to prosecute because of insufficient evidence. More than five years after the mother first made the allegations to police, when the victim no longer is living with the abuser or finally is able to recall fully the abuse, the victim comes forward to report the abuse. The only construction of the statute that would effectuate the legislature's manifest intent is that the victim's notification alone triggers the statute of limitations.

By contrast, we note that, in other statutes, the legislature expressly has defined "victim" to encompass the victim's parent or legal representative; see General Statutes (Sup. 2006) §§ 46b-122 and 54-76h,[13] or expressly has conferred rights on the victim's parent or legal representative, in addition to the victim. See General Statutes §§ 46b-138b and 54-204 (a).[14] Although these

---

[13] General Statutes (Sup. 2006) § 46b-122 provides in relevant part: "Any judge hearing a juvenile matter may, during such hearing, exclude from the room in which such hearing is held any person whose presence is, in the court's opinion, not necessary, except that in delinquency proceedings, any victim shall not be excluded . . . . *For the purposes of this section, 'victim' means a person who is the victim of a delinquent act, a parent or guardian of such person, the legal representative of such person or an advocate appointed for such person pursuant to section 54-221.*" (Emphasis added.)

General Statutes (Sup. 2006) § 54-76h (b) addresses the private nature of proceedings concerning youthful offenders and provides in relevant part: "In a proceeding under sections 54-76b to 54-76n, inclusive, the court shall not exclude any victim from such proceeding or any portion thereof . . . . *For the purposes of this subsection, 'victim' means a person who is the victim of a crime for which a youth is charged, a parent or guardian of such person, the legal representative of such person or an advocate appointed for such person pursuant to section 54-221.*" (Emphasis added.)

[14] General Statutes § 46b-138b provides: "In any proceeding concerning the alleged delinquency of a child, any victim of the alleged delinquent conduct, the parents or guardian of such victim, an advocate for such victim, appointed under section 54-221, or such victim's counsel shall have the right to appear before the court for the purpose of making a statement to the court concerning the disposition of the case."

General Statutes § 54-204 (a) provides: "Any person who may be eligible for compensation or restitution services, or both, pursuant to this chapter may make an application therefor to the Officer of Victim Services. If the

statutes deal with different subject matter than § 54-193a, they demonstrate that the legislature, when it has deemed it necessary, has assigned explicitly the legal rights of a minor victim to that minor's parents, guardian, and other legal representatives. There is, however, no such expansive language in § 54-193a. As a general matter, this court does not read language into a statute. *Echavarria* v. *National Grange Mutual Ins. Co.*, 275 Conn. 408, 416–17, 880 A.2d 882 (2005). "[W]e are bound to interpret legislative intent by referring to what the legislative text contains, not by what it might have contained." (Internal quotation marks omitted.) *Laliberte* v. *United Security, Inc.*, 261 Conn. 181, 186, 801 A.2d 783 (2002).

To the extent that the defendant questions this policy decision, because the legislature permits a minor's legal representative to act on behalf of the minor in other circumstances, we note that this decision is one that rests squarely with the legislature. This court has recognized that "statutes of limitation represent legislative assessments of relative interests of the [s]tate and the defendant in administering and receiving justice . . . and as such, they reflect the legislature's considered judgment as to the difficult balance between the public demand for justice and the [interest] of the individual to be free from the continual threat of prosecution for past misconduct." (Citation omitted; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 686, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). Because it would not be uncommon for a parent or legal representative to report abuse, particularly in the case of a preverbal child, we cannot say that this circumstance was one that the legislature could not have envisioned when it enacted § 54-193a. The legislature has made clear that it considers it a

person entitled to make application is a minor or incompetent person, the application may be made on such person's behalf by a parent, guardian or other legal representative of the minor or incompetent person."

priority that the *victim* has a fair opportunity to report the abuse. Therefore, the defendant's prosecution on the charge of sexual assault in the first degree was not time barred under § 54-193a.

B

We next address the defendant's contention that his prosecutions for the risk of injury counts in both cases were time barred. The defendant contends that § 54-193, which sets the statute of limitations for nonclass A felony offenses generally, governs these counts rather than § 54-193a, which provides the extended statute of limitations for sexual offenses against minors. Specifically, he claims that § 54-193a applies only to offenses for which sexual abuse, sexual exploitation or sexual assault of a minor is an element of the crime, and that risk of injury is not such an offense because conduct other than sexual acts against minors is encompassed within that offense. We reject this claim.

At the time of the offenses with which the defendant in the present case was charged, there was a five year statute of limitations for "any offense, except a capital felony, a class A felony or a violation of section 53a-54d [arson murder], for which the punishment is or may be imprisonment in excess of one year . . . ." General Statutes (Rev. to 1993) § 54-193 (b). If § 54-193 were to apply, the defendant's prosecutions for risk of injury to a child clearly would be barred because the offenses occurred in 1994 or 1995, and his arrest warrant was not signed until 2001. As we have noted previously, however, General Statutes (Rev. to 1993) § 54-193a, as amended by P.A. 93-340, § 11, provides in relevant part that, "[n]otwithstanding the provisions of section 54-193, no person may be prosecuted for any offense involving sexual abuse, sexual exploitation or sexual assault of a minor except within [the prescribed

extended period of limitations] . . . ." See footnote 6 of this opinion.

At the time of the charged conduct, the statutory provision regarding the offense of risk of injury to a child provided in relevant part: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both." General Statutes (Rev. to 1993) § 53-21. It is well established that the statute's proscription on actions that create a risk of "impair[ing]" the "health or morals" of a child encompasses a broad range of acts, including sexual acts against minors. See *State* v. *Pickering*, 180 Conn. 54, 64, 428 A.2d 322 (1980) (noting that our "opinions pursuant to § 53-21 make it clear that the deliberate touching of the private parts of a child under the age of sixteen in a sexual and indecent manner is violative of that statute"). Although the legislature amended the statute in 1995 to address expressly such sexual acts; see Public Acts 1995, No. 95-142, § 1;[15] we have noted that, "[w]hether by judicial construction, as with the pre-1995 amendment version of § 53-21, or by express codification, as with the post-1995 amendment version

[15] Specifically, the legislature amended § 53-21 to designate the existing provision as subsection (1) and to add subsection (2), expressly providing that any person who "has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a class C felony." Public Acts 1995, No. 95-142, § 1. The defendant concedes that the extended statute of limitations in § 54-193a would be applicable to subsection (2) of § 53-21 as amended. He claims, however, that § 54-193a "does not apply to subsection (1), which contains the statutory language in effect when the alleged crime was committed and which is set forth in the charging document."

of § 53-21 . . . sexual abuse of [a child] was proscribed under the statute." *State* v. *James G.*, 268 Conn. 382, 409, 844 A.2d 810 (2004).

Therefore, the question is whether, by creating an extended statute of limitations for "*any* offense . . . *involving* sexual abuse, sexual exploitation or sexual assault of a minor"; (emphasis added) General Statutes (Rev. to 1993) § 54-193a, as amended by P.A. 93-340, § 11; the legislature intended that the statute apply to any such conduct or only to such conduct when it expressly is prescribed as an element of the offense. An examination of other criminal statutes yields the answer to this question. Section 54-193a is one of three criminal statutes of limitations. Notably, in both of the other statutes of limitations, the legislature specifically has provided the statutory provisions to which the limitations period applies; see General Statutes § 54-193b;[16] or has delineated the statutory provisions or classes of offenses that are excluded from the limitations period. See General Statutes (Rev. to 1993) § 54-193.[17] By contrast, in § 54-193a, the legislature did not cite specific statutes to which the expanded limitations period applies; rather, it used a broad descriptive phrase, "any

[16] General Statutes § 54-193b provides: "Notwithstanding the provisions of sections 54-193 and 54-193a, a person may be prosecuted for a violation of section 53a-70, 53a-70a, 53a-70b, 53a-71, 53a-72a or 53a-72b not later than twenty years from the date of the commission of the offense, provided (1) the victim notified any police officer or state's attorney acting in such police officer's or state's attorney's official capacity of the commission of the offense not later than five years after the commission of the offense, and (2) the identity of the person who allegedly committed the offense has been established through a DNA (deoxyribonucleic acid) profile comparison using evidence collected at the time of the commission of the offense." Although § 54-193b was enacted in 2000; see Public Acts 2000, No. 00-80, § 1; we nonetheless find it useful in discerning the type of language that the legislature could have used in 1995 had it intended that § 54-193a have a more limited, specific reach.

[17] See footnote 7 of this opinion for the text of § 54-193 as it existed at the time of the offenses in the present case.

offense[s] involving . . . ." General Statutes (Rev. to 1993) § 54-193a, as amended by P.A. 93-340, § 11. It is difficult to imagine how the legislature could have phrased the statute more expansively and yet still limited its reach to sexual acts against children.

Had the legislature intended § 54-193a to apply only to those statutes for which sexual abuse, sexual exploitation or sexual assault of a minor is an "element of the offense," it readily could have so provided. Indeed, in several other criminal statutes, the legislature has applied such a phrase. See General Statutes § 53a-5 (addressing mental state for criminal liability; "some element of an offense" and "every element of the offense"); General Statutes § 53a-7 (addressing effect of intoxication as defense; "an element of the crime charged"); General Statutes § 53a-49 (b) (7) (addressing sufficiency of conduct for criminal attempt; "conduct constituting an element of the crime"); General Statutes § 54-86i (addressing expert testimony on mental state or condition of defendant; "mental state or condition constituting an element of the crime charged"); see also General Statutes § 20-281a (a) (8) (addressing grounds for revocation or suspension of certificate, license or permit; "[c]onviction of a felony, or of any crime an element of which is dishonesty or fraud").

We also are mindful of the legislative policy that is evident by the terms of § 54-193a. As we noted in part I A of this opinion, the legislature has created an extended limitations period to allow child sexual abuse victims, who may be unable to come forward at the time the offense has occurred, a reasonable opportunity to report the abuse. It would thwart that purpose and create disharmony to apply the extended statute of limitations to a sexual assault offense, but apply the general limitations period of five years from the date of the offense to a risk of injury charge involving the same conduct. The law prefers rational and prudent

statutory construction, and we seek to avoid interpretations of statutes that produce odd or illogical outcomes. See *State* v. *Sandoval*, 263 Conn. 524, 553, 821 A.2d 247 (2003).

Finally, we note that the bill analysis prepared for the General Assembly summarizing the changes made by Public Act 1990, No. 90-279, which was codified as § 54-193a and set forth the limitations period in § 54-193a prior to the addition of the victim notification provision in 2002, discussed the effect on the amendment on the pertinent criminal statutes—one of those statutes being risk of injury to a child. See Office of Legislative Research Amended Bill Analysis for Substitute House Bill No. 6019, as amended by House Amendments A and B, p. 5. Although this summary is not evidence in and of itself of legislative intent,[18] it evinces that the legislature had knowledge that § 54-193a could be construed to apply to the offense of risk of injury to a child. Had the legislature not intended that effect, it seems likely that it would have taken some action to clarify § 54-193a, such as requiring that the conduct be an "element of the crime."

In the present case, sexual assault or abuse, specifically, the defendant's sexual intercourse by way of fellatio with the two minor victims, was not a nonessential aspect of the crime. Rather, this conduct was *the* essential fact charged in the amended substitute informations necessary to prove an element of the offense of risk of injury. The fact that conduct other than that of a sexual

---

[18] The summary of Public Act No. 90-279 prepared by the office of legislative research expressly provides: " 'The following fiscal impact statement and bill analysis are prepared for the benefit of members of the General Assembly, solely for purposes of information, summarization and explanation and do not represent the intent of the General Assembly or either house thereof for any purpose.' " Office of Legislative Research Amended Bill Analysis for Substitute House Bill No. 6019, as amended by House Amendments A and B, p. 4.

nature also would violate the statute, but would be governed by a different statute of limitations, also does not suggest a contrary reading of § 54-193a. The statute governing sexual assault in the first degree, § 53a-70, contains several subsections of which only one applies to a minor victim and thus would be governed by § 54-193a. Indeed, the post-1995 version of § 53-21 undeniably would be governed by two different statutes of limitations, depending on which subsection of the statute has been violated. See footnote 15 of this opinion.

In sum, there is simply no persuasive evidence that the legislature intended for § 54-193a to be limited to crimes of which an express element of the offense is sexual abuse, sexual exploitation or sexual assault. Accordingly, we conclude that the defendant's prosecution for the two counts of risk of injury as to S.J. and K.M. were not time barred.

II

The defendant's next claim is that his conviction with respect to his conduct involving S.J. must be reversed because the trial court improperly permitted S.J. to testify. Specifically, the defendant contends that the trial court's findings that S.J. had not been hypnotized and that his memories of abuse were not implanted as a result thereof were contradicted by overwhelming evidence to the contrary. The defendant further claims that hypnotically induced testimony is inadmissible in Connecticut, or, at the very least, is inadmissible in the absence of certain safeguards as to reliability, which were not undertaken in the present case. We conclude that the trial court was not compelled by the evidence to conclude that S.J.'s testimony was a product of hypnosis.

The following additional facts are relevant to our resolution of this claim. At the hearing on the defendant's motion in limine to exclude S.J.'s testimony, the

following exhibits were presented to the trial court: (1) the June 6, 1996 department notification to the police of suspected abuse, which had been prepared by Plante, the department investigator, after interviewing S.J. when he first made the allegations against the defendant; (2) a December 4, 1996 "Harmony Hill School Treatment Team Evaluation Summary" (Harmony Hill evaluation) summarizing S.J.'s history and treatment progress; and (3) a September 10, 2000 report, prepared by Leslie Lothstein, a clinical psychologist.[19]

Plante's June, 1996 report revealed the following account of her interview with S.J., in which S.J. had reported his sexual abuse by the defendant. When Plante asked S.J. "about the manner in which this memory came to him, he responded, 'I was sitting in my room, hypnotizing myself, trying to bring out memories.' [S.J.] continued that a picture came to him. [S.J.] remembered 'Dad,'[20] who made him do sexual things to him."

The Harmony Hill evaluation provided: "In [December, 1995, S.J.] indicated to [Harmony Hill] staff that [the defendant] . . . had sexually abused him several times. . . .[21] In [December, 1995], after several months of assessment, [S.J.] was declared [as having various dissociative disorders] by the Chief Clinical Psychologist at [Harmony Hill]. Since that time, in addition to

[19] Although these reports are deemed confidential under state law; see General Statutes §§ 17a-28, 52-146d and 52-146c; S.J. waived his right to confidentiality to allow the court to consider this evidence.

[20] Plante's report and S.J.'s testimony made clear that "Dad" referred to the defendant.

[21] The time lapse between S.J.'s December, 1995 revelation of the abuse and Plante's June, 1996 interview may be explained by the fact that, according to a Harmony Hill social work department report, which was prepared by Harmony Hill therapist Donald Morse and was attached to the December, 1996 Harmony Hill evaluation, S.J. first had made the abuse allegation to a family youth counselor and then to his therapist, the latter revelation apparently prompting the report to the department.

weekly group and individual therapy, [S.J.] has had many sessions with his therapist and the Chief Clinical Psychologist. With [the department's] permission, hypnotherapy has been used with [S.J.]. No disclosures relating to his allegations have been made while [S.J.] has been in [a] hypnotic trance."

Lothstein, the director of psychology at the Institute for Living, Hartford Hospital's mental health division, had prepared his September, 2000 report after conducting an interview with S.J. in August, 2000, when S.J. was seventeen years old and in the care of the department of mental health and addiction services. The report was prepared at the behest of that department to provide a clinical assessment of S.J.'s suitability for a return to the community. Lothstein's report provided: "In reliving his childhood experiences it is often difficult for [S.J.] to distinguish fantasy from reality. Unfortunately, as a result of being diagnosed with a Dissociative Identity Disorder he was provided hypnotherapy in order to recover memories of abuse. Subsequently, it appears as if his therapist may have implanted abusive memories in him. Any psychotherapist who treats him needs to get detailed information about this therapy as it appears to have been counter-productive.

"Given the above comments all of [S.J.'s] memories become subject to possible revision. For example, all of his allegations of sexual abuse are at issue. He recalled being severely abused by his adoptive father Mr. J. . . .[22]

"[S.J.] said, 'they did hypnotherapy to me at Harmony [Hill] that got me messed up. I can't think straight. It affected me more than it helped me.' He recalls the process as very emotionally arousing and being

---

[22] Given that Lothstein identified the defendant by name, we presume that either Lothstein mistakenly assumed, or S.J. mistakenly stated, that the defendant was S.J.'s adoptive father.

'flooded' by memories and emotions of sexual abuse. He was at Harmony [Hill] for two years during which the hypnotherapy took place. He doesn't recall any individual therapy, group therapy or sex offender therapy. This needs to be corroborated by [Harmony Hill]. If this turns out to be the case then one might view his treatment there as not meeting a standard of care. However, it is also possible that he is distorting what happened or doesn't remember his treatment in detail."

The trial court also heard testimony from Lothstein. During the defendant's direct examination, Lothstein testified that the information as to the hypnotherapy treatment had come from S.J. When questioned by the defendant as to his conclusion in his report that, "[a]ny psychotherapist who treats [S.J.] needs to get detailed information about this therapy as it appears to have been counter-productive," Lothstein further testified that this comment must be considered in light of his other concern noting the possibility that S.J. was distorting or did not remember what had happened with respect to this treatment. Lothstein explained: "I didn't have any corroborating evidence that what he was telling me was true, so I just had to go on what he was telling me. I don't believe there was anything in the record, otherwise I would have noted it, that would corroborate the hypnotherapy . . . ." The defendant then elicited testimony from Lothstein that, although he could not comment on S.J.'s hypnotherapy because he had not explored that issue in great detail with S.J., as a general matter, scientific literature has indicated that it is possible for hypnotherapy to implant false memories. Lothstein underscored that, because he was unable to ascertain whether S.J. had been truthful in his description of the therapy, he simply recorded S.J.'s description.

During the state's cross-examination, Lothstein testified that a statement in his report, noting that S.J. never

had been diagnosed with a post-traumatic stress disorder as a result of his serious history of abuse, was intended to reflect that S.J. had exhibited symptoms that were consistent with that disorder: "flashbacks, somatic reactivation, startle response, being flooded with emotional imagery, having preoccupation with the event or events that he either perceived or witnessed or experienced reoccurring in those flashbacks." Lothstein agreed with the state that it was fair to say that "when somebody presents with those symptoms from [post-traumatic stress disorder], they're often presenting with flashbacks of real memories, memories that actually occurred to them . . . ."

The trial court also heard the following testimony from S.J. as to his treatment and the circumstances under which he first had recalled the abuse. S.J. admitted that he had not told anyone of the defendant's abuse prior to reporting it to a Harmony Hill staff member because: he thought it was "a normal thing," given that he had not heard any other child complain about such sexual activity before he came to Harmony Hill; he did not think anyone would believe a child making such accusations; and he was embarrassed about the events. S.J. made the allegations after he had been transferred from the care of a male therapist, Donald Morse, with whom S.J. did not feel comfortable, to a female therapist, whose name S.J. could not recall. S.J. testified that the memories of the defendant's abuse "were always in my head and eating me alive, basically." S.J. testified that he had told this female therapist: "[T]here's a lot of things I need to explain, I just don't feel comfortable talking about them, I feel really—I don't know how to explain it—embarrassed. I don't know really how to get it out. So, she described—there's this thing that she would teach me to relax and be able to be like just in a relaxed state in order to talk to her." S.J. described the method of relaxation in the following manner: "All

you have to do is sit there, close your eyes, put your arms straight out, and just count to like—just relax, totally relax and let your arms drop until you feel totally relaxed and believe as if nobody was in front of you so you're talking to like thin air and you're getting it out." In response to a question as to whether the therapist had a name for this method, S.J. stated that she had described it as "just a relaxation technique. It was like when I got overworked too and I started crying during it, she'd just have me deep breathe—do deep breaths." On several occasions when using this technique, S.J. told his therapist about episodes in which S.J. had engaged in oral sex with the defendant. S.J. explained that he knew he was "conscious" during these sessions because he would get up to use the bathroom a couple of times during the session, without prompting from the therapist. S.J. further explained that he always had known the things that came out during the sessions, but, by closing his eyes and pretending that the therapist was not there, it was easier to disclose the information. S.J. indicated that he had no memory of speaking to Plante, nor any recollection of ever having used the term hypnotherapy, and that self-hypnosis sounded "kind of impossible actually." S.J. also could not recall meeting with Lothstein, nor did he recall making any of the statements contained in Lothstein's report as to the hypnotherapy.

After reviewing the documents and testimony, the trial court found that, "based on the record before it, [S.J.] was not hypnotized. Therefore, the motion in limine is denied on the basis that there is no evidence— no conclusive evidence—to indicate that . . . [S.J.] was in fact hypnotized and that the statements were subsequent to any such hypnotherapy." The court emphasized that the only evidence before it that described in detail the actual procedures followed was S.J.'s testimony, in which he was adamant that he had

not been hypnotized and in which he described his actions and a conscious state of mind in a way that would be inconsistent with a finding that S.J. had been hypnotized.

On two previous occasions, this court has addressed the issue of the effect of hypnosis on the admissibility of testimony. In *State* v. *Pollitt*, 205 Conn. 61, 81, 530 A.2d 155 (1987), it was undisputed that the witness had undergone hypnosis and had made similar statements both during and immediately following the hypnosis session that the state sought to introduce at trial. In that case, this court approved of the rule that "a witness who has previously been hypnotized is competent to testify at trial where that testimony is consistent with his prehypnotic recollection." Id. The court also approved of the general rule set forth by other courts "that hypnosis affects the credibility, but not the admissibility, of testimony."[23] Id., 84.

Thereafter, in *State* v. *Joly*, 219 Conn. 234, 237, 593 A.2d 96 (1991), this court addressed a challenge similar to the one asserted in the present case, namely, that the trial court should have suppressed a witness' testimony as the unreliable product of hypnosis. As in the present case, the trial court in *Joly* had concluded that the witness had not been hypnotized.[24] Id., 240. This

---

[23] In *State* v. *Pollitt*, supra, 205 Conn. 85, given the facts of that case, this court expressly declined to address the issue of the admissibility of posthypnotic testimony that is inconsistent with a witness' statements made prior to an improperly conducted hypnosis session.

[24] In *State* v. *Joly*, supra, 219 Conn. 238, the witness had agreed to undergo hypnosis to aid in his recall of the name of the person whom the witness had seen with the victim. The psychologist who had conducted the hypnotic session opined that the witness, at some point, went into a hypnotic trance, during which time the witness had provided a French name, which was not the defendant's name, as the person whom he had seen. Id., 238–39. The psychologist also admitted, however, that it was possible that the witness had been feigning the hypnotic state. Id., 239. The witness testified that, at no time during the session had he achieved a hypnotic state or been unaware of what was happening, that several days before the session he had recalled the defendant's name as the person whom he had seen with the victim, and

court noted that, "[w]here no one disputes that hypnosis occurred, a court might reasonably presume that hypnosis in fact occurred and go on to consider whether the proffered hypnotically refreshed testimony accurately reflects the witness' true memory, or rather, the distorted and unreliable product of hypnotic suggestion, confabulation, or memory hardening. See *State* v. *Pollitt*, [supra, 205 Conn. 78–81]; see also *Rock* v. *Arkansas*, 483 U.S. 44, 59–61, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). In this case, however, the state argued and the court decided that hypnosis had not occurred." *State* v. *Joly*, supra, 241. Accordingly, in *Joly*, the court concluded that this threshold determination, namely, "whether a witness has in fact been hypnotized is appropriately committed to the sound discretion of the trial court. In resolving this issue, the court may be aided, but is not bound, by expert opinion. . . . Such testimony must be considered, weighed and tested like any other evidence . . . and assessed in relation to the other circumstances in evidence bearing on the question in issue . . . including, if offered, the testimony of the allegedly hypnotized witness. The trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible . . . and expert testimony may be rejected in favor of other evidence found more persuasive. . . . The trial court's preliminary determination of whether a witness has in fact been hypnotized will not be disturbed on appeal except for an abuse of discretion." (Citations omitted; internal quotation marks omitted.) Id., 243–44.

As an initial matter, we note that these cases do not support the defendant's contention that our case law suggests that hypnotically induced testimony is per se inadmissible, without any inquiry into its reliability. In the present case, however, the issue is the predicate

that he intentionally had made up the French name because he had been displeased with his treatment by the police. Id., 239–40.

question of whether the trial court abused its discretion in concluding that S.J. had not been hypnotized and that his recollection was not a product of hypnosis.

Although the defendant presented no expert testimony as to what "hypnotherapy" is, there was some evidence that S.J. had been hypnotized at some time while he was at Harmony Hill. Specifically, the December, 1996 evaluation noted the use of hypnotherapy and implicitly indicated that S.J. had been in a "hypnotic trance." Nonetheless, there was more than sufficient evidence from which the trial court properly could have concluded that, even if S.J. had been hypnotized at some time during his treatment at Harmony Hill, his recollection of the abuse was not a result of that hypnosis.

It is significant that there was no first person account, other than that provided by S.J., of his treatment and the circumstances under which he recalled the abuse.[25] We are mindful that S.J.'s testimony labeling that process as a "relaxation technique" was inconsistent with his statements to Plante and Lothstein labeling that process as self-hypnosis and hypnotherapy. Notably, however, neither Plante nor Lothstein explored with S.J. what he meant by those labels, and it is reasonable to assume that S.J. simply was repeating terms that he had heard used by Harmony Hill staff without fully understanding their meaning. Furthermore, the defendant did not offer any expert testimony to discredit S.J.'s conclusion that he had not been in a hypnotic trance when he recounted the abuse to his Harmony Hill therapist, based on the fact that he had been conscious of the events around him and had interrupted

[25] The defendant represented to the trial court at the motion in limine that the therapist who had conducted these sessions was unavailable to testify because she no longer worked at Harmony Hill and could not be located.

the sessions to use the bathroom.[26] Indeed, Lothstein had indicated that S.J.'s description of being flooded with memories of abuse was entirely consistent with a person who suffers from post-traumatic stress disorder and that, in such a case, those memories often are real, rather than imagined.

Although the Harmony Hill report reflects a staff member's conclusion that S.J. had achieved a hypnotic state during his hypnotherapy, there is no evidence as to the basis for that conclusion. See footnote 26 of this opinion. Additionally, even *if* S.J. had been in a hypnotic state, there is no evidence as to the timing of the session or sessions to indicate whether any had occurred before S.J. first reported the abuse to the Harmony Hill staff. See footnote 21 of this opinion. Significantly, however, the report does state unequivocally that S.J. had made no statements regarding the abuse while in a hypnotic state.

Accordingly, we cannot conclude, on the basis of the record before it, that the trial court abused its discretion in finding that S.J.'s recollection of his abuse by the defendant was not a product of hypnosis. Therefore, the trial court properly denied the defendant's motion to exclude S.J.'s testimony.

---

[26] In *State* v. *Joly*, supra, 219 Conn. 242, we noted: "The defendant also points out that authorities on hypnotism caution that 'very often hypnotic subjects have refused to believe they actually went into a trance. Some claim they were wide awake during the whole experience, others that nothing unusual happened, still others that they were only pretending to be hypnotized.' B. Diamond, 'Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,' 68 Cal. L. Rev. 313, 334 (1980). Such authorities nonetheless acknowledge that 'even the best experts cannot consistently distinguish between actual and pretended hypnosis' and that 'no reliable and truly objective criteria [for detecting] the state of hypnosis have yet been discovered'; B. Diamond, supra, 337." In the present case, there was no expert testimony before the trial court on hypnosis except Lothstein's general statement that literature in the field indicates that it is possible for false memories to be implanted during hypnotherapy.

### III

We next turn to the defendant's claim that the trial court improperly precluded him from exercising peremptory challenges to exclude male venirepersons from the jury on the basis of their gender. The defendant recognizes that the United States Supreme Court has held that the government's exercise of peremptory challenges to strike potential jurors on the basis of both race and gender violates the equal protection clause. See *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994) (peremptory challenges based on gender); *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) (peremptory challenges based on race). The defendant also recognizes that the Supreme Court has held that a criminal defendant's exercise of race-based challenges similarly is violative of the mandates of equal protection. See *Georgia* v. *McCollum*, 505 U.S. 42, 57, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992); see also *Edmonson* v. *Leesville Concrete Co.*, 500 U.S. 614, 616, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991) (civil litigants barred from exercising race-based challenges). Nonetheless, the defendant contends that a criminal defendant's exercise of gender-based challenges is permissible.

Specifically, he urges us to adopt the position advocated by Justice O'Connor in her concurrence in *J.E.B.* v. *Alabama ex rel. T.B.*, supra, 511 U.S. 147, in which she suggested that the court limit to the facts of that case its holding that peremptory challenges based on gender are unconstitutional and bar only the *government's* use of gender-based peremptory strikes. The defendant contends that a distinction between a criminal defendant's exercise of challenges based on gender and challenges based on race is warranted because a less exacting standard of scrutiny is applied by the courts to gender-based equal protection challenges. See *Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200, 247,

115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995) (Stevens, J., dissenting) (noting that intermediate scrutiny applies to cases of gender discrimination and strict scrutiny applies to cases of race discrimination). The defendant asserts that, in the present case, there was a legitimate correlation between gender and attitude in that he believed that male jurors would be more inclined than female jurors to hold a bias against him because of his effeminate mannerisms and the nature of the offenses, involving oral sex with young men.[27] Accordingly, he contends that his gender-based challenges were a proper exercise of his constitutional right to due process and a fair trial that supersedes the mandates of equal protection.[28] We disagree.

There is no dispute as to the underlying facts. Prior to jury selection, the defendant alerted the trial court of his intention to exercise peremptory challenges to exclude male jurors. Accordingly, when the defendant thereafter challenged male venirepersons, the trial court required that the defendant articulate his basis for doing so. See *State* v. *Latour*, 276 Conn. 399, 408, 886 A.2d 404 (2005) ("[o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal" [internal

---

[27] At oral argument to this court, defense counsel described the defendant as having "Capote-like" qualities, referring to the author Truman Capote.

[28] We note that the defendant correctly points out that, although the federal constitution does not guarantee the right to peremptory challenges, only the right to an impartial jury that may be protected through such means; see *United States* v. *Martinez-Salazar*, 528 U.S. 304, 311, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000); our state constitution expressly guarantees the right to peremptory challenges. See Conn. Const., amend. IV. The defendant does not explain, however, in what way that distinction should bear on the issue before us and has not performed the analysis set forth in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), that is a prerequisite to asserting an independent claim under the state constitution. See *State* v. *Nash*, 278 Conn. 620, 623–24 n.4, 899 A.2d 1 (2006) (setting forth analysis required under *Geisler*). Therefore, we ascribe no significance to that difference in our analysis.

quotation marks omitted]). The defendant attempted to use peremptory challenges to strike six of seven male jurors and one male alternate juror. In all but two instances in which the defendant had asserted gender as the sole basis for striking the juror, the court permitted the defendant to exercise his challenges. Thus, the jury rendering the verdicts in the defendant's cases was comprised of three women, one man against whom the defendant did not assert a challenge and two men whom the court impaneled over the defendant's objections.

Although the defendant correctly points out that the United States Supreme Court has not yet been presented with a direct challenge to a criminal defendant's exercise of a peremptory challenge on the basis of gender, in dicta, that court expressly has indicated that such actions are constitutionally proscribed: "To date this [c]ourt has recognized only one substantive control over a federal criminal defendant's choice of whom to challenge peremptorily. Under the [e]qual [p]rotection [c]lause, a defendant may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race." *United States* v. *Martinez-Salazar*, 528 U.S. 304, 314–15, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000). Indeed, in our view, a proscription on a criminal defendant's exercise of gender-based challenges is compelled by the legal underpinnings of the court's decisions in *J.E.B.* and *McCollum*.[29]

In *J.E.B.*, the court expressly rejected the proposition that challenges on the basis of gender should be treated differently than those based on race. *J.E.B.* v. *Alabama*

---

[29] We presumed as much recently in *State* v. *Latour*, supra, 276 Conn. 407–409 and n.8. See id., 412–13 (assuming, without deciding, that trial court improperly rejected defendant's credible nongender-based reason to exclude female juror as pretextual and hence violation of *Batson*, but concluding that denial of peremptory challenge was harmless given that juror was alternate who did not influence deliberative process).

*ex rel. T.B.*, supra, 511 U.S. 135. The court noted that the long history of exclusion of women from juries was not unlike that of African-Americans. Id., 131–35. It further concluded that, irrespective of whether there was a degree of difference between the exclusion of the two classes, "[w]e shall not accept as a defense to gender-based peremptory challenges the very stereotype the law condemns. . . . Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings. . . . The community is harmed by the [s]tate's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders." (Citations omitted; internal quotation marks omitted.) Id., 138–40.

The suggestion that a defendant's right to a fair trial supersedes the mandates of equal protection simply cannot be squared with *McCollum*'s holding barring a criminal defendant from excluding jurors on the basis of race and its emphasis on the juror's right to nondiscriminatory jury selection procedures. Indeed, *J.E.B.* cited *McCollum* for the proposition "that, whether the trial is criminal or civil, potential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." Id., 128; see also id., 140–41. We reject the notion that the balancing of the constitutional interests in cases of race somehow yields a different result when undertaken in cases of gender simply because of the lesser, but clearly exacting, standard of scrutiny applied to gender discrimination. Although four members of the

*J.E.B.* court expressed the view that the court previously had erred by treating civil litigants and criminal defendants exercising juror challenges as state actors for purposes of equal protection; id., 150–51 (O'Connor, J., concurring); id., 158 n.2 (Scalia, J., dissenting); that rule still remains good law.

Moreover, we agree with the *J.E.B.* court that effective examination of potential jurors during voir dire can elicit responses demonstrating that the defendant's concerns have some legitimate basis unfounded on mere stereotype. See id., 143. We are mindful of a concern expressed in Justice O'Connor's concurrence in *J.E.B.* that to require a response that demonstrates actual or implied bias could in effect impose the same standard on peremptory challenges as that applied to for cause challenges. See id., 149–50. Such a concern, however, applies with equal force in cases of race and yet we would not permit discriminatory selection on that basis. Furthermore, in our view, the defendant is not required to elicit a response that rises to that level. Indeed, in the present case, the trial court permitted the defendant to strike male jurors when there was any tenuous basis relating to the merits of the case and not the mere fact of gender.[30]

In sum, we cannot sanction the perpetuation of gender-based stereotypes in jury selection absent an exceedingly persuasive justification. Id., 137. The defendant has not demonstrated that his right to a fair trial and an impartial jury was infringed by the trial court's refusal to allow him to strike jurors solely on the basis

---

[30] For example, during voir dire, a male potential juror stated that the nature of the charges "made my stomach turn." The defendant sought to strike the venireperson on the ground that the venireperson was male and because the discomfort expressed by the venireperson was a discomfort felt by men generally. The trial court permitted the defendant to exercise the challenge, concluding that the venireperson's discomfort was a sufficient reason to exercise the peremptory challenge on a basis other than gender.

of their gender. Accordingly, we conclude that the trial court properly precluded the defendant from exercising peremptory challenges on the basis of gender.

## IV

We next consider the defendant's claim that the trial court improperly permitted the state to introduce an entry in a department report (report entry) as a business record to corroborate certain witnesses' testimony. The defendant contends that the report entry contained multiple levels of inadmissible hearsay and that the admission of these hearsay statements violated his constitutional right of confrontation under *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).[31] We agree with the defendant that the trial court improperly admitted the report entry, but conclude that the error was harmless.

The record reveals the following additional facts. In its rebuttal case, the state sought to introduce, through Kathleen Harkins, a principal attorney for the department, an entry from Plante's "investigation protocol." That protocol contained numerous dated entries tracking the progress of Plante's investigation into S.J.'s sexual abuse allegations. The state sought to introduce the following report entry dated November 12, 1996: "[Telephone call from] . . . Morse—Mr. Morse informed this worker that [S.J.] gave a list of names to a staff person over the weekend. These names represent the kids who knew about [the defendant's] sexual involvement with [S.J.]. The list is as follows: [C.M.], [J.N.], [T.C.] and [M.G.]." The state claimed that the

---

[31] The defendant also claims that: (1) the admission of the report entry violated this court's limitations on constancy of accusation evidence; and (2) "[i]f the [department] protocol was properly admitted, it was error to admit only that portion offered by the state and to exclude that portion subsequently offered by the defense." In light of our conclusion that the admission of the report entry, with respect to S.J.'s statement therein, was improper but harmless, we need not address these contentions.

report entry was probative to rebut the defendant's attempts to impeach the testimony of J.N., T.C. and M.G., who had testified as to certain sexually inappropriate remarks and actions by the defendant, as a recent fabrication for the benefit of Eleanor J. in her divorce from the defendant.[32] The state further claimed that it was seeking to use S.J.'s statement for nonhearsay purposes, as a prior consistent statement and for the fact that S.J. merely had named these persons at an earlier time. Over the defendant's objections on hearsay and confrontation grounds, the trial court ruled that: the report entry was nontestimonial in nature, and thus not subject to the strictures of *Crawford* v. *Washington*, supra, 541 U.S. 36; S.J.'s statement was being offered for the nonhearsay purposes suggested by the state; and even if the report entry was hearsay, it fell within the business records exception to hearsay.

At the outset, we note that our standard of review for the trial court's evidentiary rulings depends on whether the claimed error is of constitutional magnitude. The court's ruling as to the nonhearsay character of the evidence is reviewed under a deferential abuse of discretion standard. *State* v. *William C.*, 267 Conn. 686, 700–701, 841 A.2d 1144 (2004). The court's ruling that the admission of the report entry did not violate the constitutional mandates of *Crawford*, however, raises a question of law over which we exercise plenary review. "[I]f an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Citation

---

[32] For reasons that are not clear from the record, C.M. did not testify; the other three young men named by S.J. did testify as to their observations of the defendant's conduct.

omitted; internal quotation marks omitted.) *State* v. *King*, 249 Conn. 645, 669 n.30, 735 A.2d 267 (1999).

We begin with the question of whether the evidence could be used for the truth of the statements therein. General Statutes § 52-180 sets forth an exception to the hearsay rule for business records. In *State* v. *William C.*, supra, 267 Conn. 686, this court considered whether a department social worker's report, which, like the report at issue in the present case, contained dated entries documenting the worker's investigation into a foster child's allegations of abuse by her foster father, satisfied the tripartite requirements of a business record under § 52-180. We concluded that such records satisfy those requirements—they were made in the regular course of business, it was within the regular course of the department's business to make such records, and the records were made at the time of the act described in the reports, or within a reasonable time thereafter. Id., 702. Indeed, we noted, that, "beyond mere department practice, the department is statutorily required to maintain the type of records at issue in this matter." Id. That the record itself satisfied the business records exception did not, however, end our inquiry. We further emphasized that, "[o]nce [the criteria of § 52-180] have been met by the party seeking to introduce the record . . . it does not necessarily follow that the record itself is generally admissible, nor does it mean that everything in it is required to be admitted into evidence. . . . For example, the information contained in the record must be relevant to the issues being tried. . . . In addition, the information contained in the report must be based on the entrant's own observation or on information of others whose business duty it is to transmit it to the entrant. . . . If the information does not have such a basis, it adds another level of hearsay to the report which necessitates a separate exception to the hearsay

rule in order to justify its admission." (Internal quotation marks omitted.) Id., 704.

In the present case, there are multiple levels to the report entry at issue: (1) S.J.'s statement to an unknown "staff member," presumably who worked at Harmony Hill with Morse; see footnote 21 of this opinion; (2) that staff member's statement to Morse; (3) Morse's statement to Plante; and (4) Plante's recording of Morse's statement in her investigation protocol. It is clear that, under *William C.*, Plante's recordation satisfies the business records exception. We also assume, without deciding, that both Morse and the Harmony Hill staff member had a duty to report S.J.'s statement to the department and, thus, their statements would fall within the scope of the business record exception. It is clear, however, that S.J. was under no duty to make his statement to the staff member. Accordingly, S.J.'s statement itself does not fall within the scope of the business record exception.

We therefore consider whether the statement was inadmissible hearsay or admissible for a nonhearsay purpose, either as a prior consistent statement or for the mere fact of having been made, as the trial court concluded. In so doing, we are mindful that the state sought to use S.J.'s statement listing the names of J.N., T.C. and M.G. as persons who knew about the defendant's sexual involvement with him to prove that their testimony was not a recent fabrication. S.J.'s statement, however, clearly was not a prior consistent statement by those witnesses that they had known about the abuse. Cf. *Daley* v. *McClintock*, 267 Conn. 399, 403, 407–408, 838 A.2d 972 (2004). It was a statement of S.J.'s belief that these witnesses knew about the defendant's conduct; he did not assert that these witnesses ever had stated that they had such knowledge. Cf. *State* v. *Sandoval*, supra, 263 Conn. 535 (police officer who had taken victim's prior consistent statement properly could

testify as to that statement). Moreover, S.J.'s statement cannot be deemed one that is consistent with his own subsequent statements. S.J. never subsequently named these persons as corroborating witnesses.

Similarly, the statement could not be admitted for the mere fact that S.J. had named these witnesses, rather than that the witnesses named actually had knowledge of the defendant's abuse. The relevancy of the statement, as expressly underscored by the state in its argument before both the trial court and this court, was that these witnesses did in fact have knowledge of the defendant's sexual involvement with S.J. in 1996, and, therefore, their statements to investigators in 2001 and at trial were not recent fabrications. As such, S.J.'s statement was being used for the truth of the matter asserted and, accordingly, the trial court improperly admitted the statement.

In order to determine which party bears the burden of demonstrating harm from that impropriety, we must address the defendant's claim that the admission of the statement implicated the confrontation concerns at issue in *Crawford* v. *Washington,* supra, 541 U.S. 36. In *Crawford,* the United States Supreme Court announced a heightened threshold for the admission of hearsay statements deemed to be testimonial. Id., 68. The court "held that '[w]here testimonial evidence is at issue . . . the [s]ixth [a]mendment demands what the common law required: unavailability and a prior opportunity for cross-examination.' . . . *Crawford* makes clear, however, that, 'when the declarant appears for cross-examination at trial, the [c]onfrontation [c]lause places no constraints at all on the use of his prior testimonial statements. . . . It is therefore irrelevant that the reliability of some out-of-court statements cannot be replicated, even if the declarant testifies to the same matters in court. . . . The [c]lause does not bar admission of a statement so long as the declarant

is present at trial to defend or explain it." *State* v. *Pierre*, 277 Conn. 42, 78, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

Although the defendant cites to case law from other jurisdictions holding that a child's statement about sexual abuse to police or child protective services constitutes a testimonial statement for *Crawford* purposes, we need not decide whether S.J.'s statement to a Harmony Hill staff member similarly is testimonial. The admission of the statement would not violate the confrontation clause because S.J. testified at trial. To the extent that S.J. had no recollection of having named these corroborating witnesses, that fact does not render him unavailable for *Crawford* purposes.[33] Id., 79 (rejecting claim that declarant was "functionally unavailable" for cross-examination as to contents of his statement because he could not remember ever having heard information recounted in written statement). Accordingly, the trial court's impropriety in admitting the report entry containing S.J.'s statement was not of a constitutional dimension.

We therefore consider whether the defendant has met his burden of proving that this error was harmful. "[A] nonconstitutional error is harmless when 'an appellate court has a fair assurance that the error did not substantially affect the verdict.' " *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006). "[W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the

---

[33] The statements in the report entry that properly were admitted as a business record also would not implicate confrontation concerns because, "[u]nder *Crawford*, business records are identified as statements that by their nature [are] not testimonial . . . . *Crawford* v. *Washington*, supra, 541 U.S. 55." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 831, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) Id., 358.

In the present case, the evidence was not of particular importance. Indeed, S.J.'s statement that these witnesses had particular knowledge of his sexual involvement with the defendant was undermined by the testimony of these witnesses. The three young men testified only that the defendant had made sexually suggestive remarks to them and that he had shown them pornographic movies; none of them indicated that they had observed the defendant engaged in sexual acts with S.J. Although J.N. testified that he had seen the defendant, S.J. and K.M. enter a bedroom of the house, he did not observe what happened thereafter and only observed S.J. exit the bedroom shortly thereafter. Additionally, despite vigorous cross-examination of these witnesses by the defendant, there was no evidence that these witnesses had fabricated their observations regarding the defendant's conduct for the benefit of Eleanor J. in her divorce proceedings. Finally, the testimony of these witnesses was corroborated in substantial part by K.M.'s testimony. Accordingly, it was a harmless impropriety to admit S.J.'s statement contained in the report entry.

## V

The defendant also claims that Judge Hadden, who presided over the trial, improperly declined to conduct an in camera review to determine whether certain confidential records pertaining to K.M. should be disclosed to

the defendant. Although Judge Clifford had conducted such a review prior to trial and had determined that these records should not be disclosed, the defendant contends that Judge Hadden improperly concluded, as a matter of law, that an independent review of the records was not required after hearing K.M.'s testimony. We disagree.

The record reveals the following additional facts. Prior to trial, the defendant subpoenaed school records and department records pertaining to K.M. and other confidential records pertaining to S.J. Pursuant to the defendant's request, Judge Clifford conducted an in camera review and determined that, although S.J.'s records should be disclosed to the defendant, K.M.'s records did not contain exculpatory evidence and, therefore, should be sealed. At trial, after K.M. had testified on direct examination for the state, the defendant moved for Judge Hadden to conduct a second in camera review of K.M.'s records to determine whether anything in those records should be provided to the defendant. Specifically, the defendant asserted that the state had elicited testimony from K.M. regarding his departure from high school one month before graduation and his work history since that time, which, in the defendant's view, inaccurately portrayed K.M. as "a model young man who has been working hard and is at school and is an Army veteran having received an honorable discharge." The defendant asserted that he believed that the truth was that K.M. is "a deeply troubled kid who's been in a lot of trouble in his life" and that K.M.'s records "probably" would reveal that fact. Because Judge Clifford did not know that the state would attempt to portray K.M. in such a manner when he had reviewed the records, the defendant asserted that Judge Hadden could make a more rational decision as to whether the records should be disclosed after having heard K.M.'s testimony. Judge Hadden denied

the request, noting that Judge Clifford had applied a liberal standard for determining whether the records contained any exculpatory evidence. Judge Hadden further determined that the specific issues raised by the defendant pertained to collateral matters that did not justify revisiting the records.

The department's records are confidential under General Statutes § 17a-28; school records are confidential under General Statutes § 10-15b. "It is well settled in this state that before a criminal defendant may obtain an in camera inspection of a witness' confidential records for purposes of impeachment, he or she must first demonstrate that 'there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken.'" *State* v. *Bruno*, 236 Conn. 514, 522–23, 673 A.2d 1117 (1996); see also *State* v. *Castonguay*, 218 Conn. 486, 505, 590 A.2d 901 (1991) ("[p]ursuant to our decisions in [*State* v. *Bruno*, 197 Conn. 326, 497 A.2d 758 (1985), cert. denied, 475 U.S. 1119, 106 S. Ct. 1635, 90 L. Ed. 2d 181 (1986), and *State* v. *Esposito*, 192 Conn. 166, 471 A.2d 949 (1984)], a defendant seeking access to privileged records that he believes contain information that would allow him to impeach a witness' ability to comprehend, know or correctly relate the truth, must make a preliminary showing that there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness" [internal quotation marks omitted]). The defendant's offer of proof "should be specific and should set forth the issue in the case to which the [confidential] information sought will relate." (Internal quotation marks omitted.) *State* v. *Betances*, 265 Conn. 493, 507, 828 A.2d 1248 (2003).

"We review a court's conclusion that a defendant has failed to make a threshold showing of entitlement to

an in camera review of statutorily protected records
. . . under the abuse of discretion standard. . . . We
must make every reasonable presumption in favor of
the trial court's action. . . . The trial court's exercise
of its discretion will be reversed only where the abuse
of discretion is manifest or where injustice appears to
have been done." (Citations omitted; internal quotation
marks omitted.) Id., 506.

The defendant has failed to demonstrate that the
records contain information even marginally related to
K.M.'s veracity or his ability to perceive and to recall
the operative events. See *State* v. *James*, 211 Conn. 555,
579, 560 A.2d 426 (1989) (trial court properly rejected
request for review of school records when "no showing
was made that the school records contained anything
relevant to the case or to the credibility of [the sexual
assault complainant]"). Whether K.M. was a troubled
youth, as the defendant hypothesizes, does not bear on
any material issue in the case. See *State* v. *Bruno*, supra,
236 Conn. 529 ("[T]he defendant established only that
[the witness] was a youth with emotional and attitudinal
problems that made the school experience difficult for
him and for school officials who dealt with him . . . .
[T]he defendant fails to demonstrate how these facts
might have affected [the witness'] testimonial capacity
in this case." [Citation omitted.]). Moreover, the defen-
dant failed to voir dire K.M. or the keepers of the records
to attempt to demonstrate that there was a reasonable
ground to believe that the records contained such infor-
mation. Accordingly, we conclude that Judge Hadden
did not abuse his discretion in concluding that the
defendant had raised collateral issues that did not
necessitate another review of the records.[34]

---

[34] We further note we have reviewed the records at issue and have found
nothing that would warrant their disclosure.

## VI

We next address the defendant's contention that the trial court improperly admitted the testimony of J.N.'s mother, N.N., regarding prior misconduct of the defendant. Specifically, the defendant points to N.N.'s testimony, over the defendant's objection, that, on one occasion when she went to pick up her son at the defendant's home, he had answered the door in his underwear, with an erection. The defendant claims that the testimony's prejudicial effect outweighed its probative value, because "the jury had observed over the course of a number of days a polite, pleasant, slightly overweight, middle-aged man in a suit and tie sitting quietly at the defense table," and the state "sought to replace this impression with the image . . . of a tumescent [man] answering the front door in his skivvies . . . ." Because the defendant does not claim that the allegedly improper admission of this evidence substantially affected the verdict, however, he cannot prevail on this claim.

It is well settled that a trial court's evidentiary ruling is reviewed under the abuse of discretion standard. See *State* v. *Kulmac*, 230 Conn. 43, 61, 644 A.2d 887 (1994) ("The primary responsibility for making these determinations [of the admissibility of prior misconduct evidence] rests with the trial court. We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion."). Simply because the trial court may have abused its discretion in admitting evidence, whose prejudice outweighed its probative value, however, does not answer the question of whether the impropriety requires reversal of the conviction. As we have noted previously, "[w]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Sawyer*,

supra, 279 Conn. 352. "[A] nonconstitutional error is harmless when 'an appellate court has a fair assurance that the error did not substantially affect the verdict.' "[35] Id., 357.

The defendant does not claim, nor could he reasonably do so in light of the evidence we have cited, that the admission of N.N.'s testimony substantially affected the jury's verdict. Accordingly, he cannot prevail on his claim.

## VII

Finally, we briefly address the defendant's claim that the state's attorney committed prosecutorial misconduct when eliciting certain testimony at trial and during closing argument. The defendant acknowledges that, although none of these claimed improprieties is sufficient to require a new trial in and of themselves, their cumulative effect deprived him of a fair trial. We disagree.

The defendant points to the following testimony, elicited by the state over the defendant's objection: (1) Nesdill testified that, when he had reopened his investigation in 2001, and interviewed K.M., M.G., T.C. and the defendant's other foster son, R.G., who did not testify at trial, "some of their statements corroborated

---

[35] In *State* v. *Sawyer*, supra, 279 Conn. 352–53, we finally resolved a long-standing inconsistency in our cases suggesting two different standards for proving harmful error for nonconstitutional evidentiary claims. See id. ("One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." [Internal quotation marks omitted.]). Although we issued our decision in *Sawyer* after the defendant had filed his briefs in the present case, we note that the defendant also did not claim harm under either of the two standards that we previously had articulated.

some of the original complaint back in [1996]";[36] (2) defense witness T.A., a longtime friend of the defendant who testified that S.J. had lied a lot and was untruthful, responded in the negative to the following question posed by the state: "Were you aware that [your son] in fact viewed pornography at [the defendant's] home?"; and (3) Nesdill testified that, during his 2001 interview of the defendant, after he had inquired about the defendant showing movies to the boys, he had announced an intention to talk about "other allegations," and the defendant had responded that "he didn't want to talk to me anymore without an attorney." The defendant claims that the first two statements improperly suggested that nontestifying witnesses—R.G. and T.A.'s son—would corroborate S.J.'s testimony. He claims that the third statement regarding "other allegations" suggested to the jury that there was "a vast number of young men out there . . . who would say the same things as the young men who have actually testified."

The defendant also points to a portion of the state's closing argument in which the state's attorney discussed the failure of her office to prosecute the defendant in 1996 and stated that, "most appallingly, [the department] at the time did not share the information with the prosecutor's office."[37] The defendant claims

---

[36] The defendant's brief omits the phrase "some of" from the phrase "some of their statements," which, in our view, is material.

[37] Although the defendant cites in his brief as improper argument only the italicized portion of the following statement by the state's attorney in her closing argument, for purposes of context, we have included other statements omitted from the defendant's brief: "[S.J.'s] former therapist, Karen Anderson, shared opinions about [S.J.] that she acknowledged herself played a large part in shutting down the [department] investigation. [S.J.'s] therapist shared opinions with Officer Nesdill that Officer Nesdill acknowledged played a large role in shutting down the criminal investigation. *The state's attorney's office bears some responsibility here, too. They had the chance to make some recommendations as to this case. They apparently looked at it, considered the input from the therapist, and no arrest was made.*

"People became so immersed in the psychobabble portion of this case that they failed to do the commonsense, criminal law investigation that they

that the state's attorney served as a witness regarding the state's reasons for failing to prosecute initially and expressed a personal belief that the original complaint was true by referring to the department's actions in not disclosing the information to the state as appalling.

"In examining claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Spencer*, 275 Conn. 171, 179, 881 A.2d 209 (2005). "To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial misconduct, therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) Id., 180.

We agree with the state that the only impropriety was the state's question, inquiring of T.A. as to whether she was aware that her son had viewed pornography at the defendant's home, when there was no evidence

---

were trained to do. No one bothered to find out whether there were any other kids hanging out at the house. All these kids, if you recall the testimony, lived within walking distance of the defendant's home. No one knocked on any doors, asked whether anybody knew . . . about things that were going on in the home, there were no search warrants done, nothing. *Really, most appallingly, [the department] at the time did not share information with the prosecutor's office. That was no fault of their own; apparently, Officer Nesdill indicated on the stand . . . ."* (Emphasis added.) At this point, the defendant objected, and, although the trial court disagreed with the ground for the objection, it instructed the jury that statements of counsel are not evidence.

of that fact. See *State* v. *Ceballos*, 266 Conn. 364, 400, 832 A.2d 14 (2003) ("when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury" [internal quotation marks omitted]). That impropriety, however, clearly did not deprive the defendant of a fair trial. The trial court instructed the jury to disregard the question, and it was an isolated incident. Moreover, five witnesses testified that the defendant had showed pornographic movies to them. Therefore, the improper suggestion that the defendant had shown such movies to a sixth boy reasonably cannot be viewed as harmful error.

The judgments are affirmed.

In this opinion the other justices concurred.